**HIRALDO P.A.**
Manuel S. Hiraldo, Esq.
(*pro hac vice*)
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, Florida 33301
mhiraldo@hiraldolaw.com
(t) 954.400.4713

**NICHOLAS & TOMASEVIC, LLP**
Craig M. Nicholas (SBN 178444)
Alex M. Tomasevic (SBN 245598)
225 Broadway, 19th Floor
San Diego, California 92101
Telephone: (619) 325-0492
Facsimile: (619) 325-0496
Email: cnicholas@nicholaslaw.org
Email: atomasevic@nicholaslaw.org

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAZRIN MASSARO, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BEYOND MEAT, INC., and PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,<br><br>Defendants. | CASE NO.: 3:20-cv-00510-AJB-MSB<br><br><u>CLASS ACTION</u><br><br>**FIRST AMENDED COMPLAINT FOR COMPENSATORY, STATUTORY AND OTHER DAMAGES, AND INJUNCTIVE RELIEF**[1] |

---

[1] Pursuant to Fed. R. Civ. P. 15(a)(1), Plaintiff hereby amends her Complaint as a matter of course thereby mooting Defendant PETA's Motion to Dismiss, [ECF No. 23].

Plaintiff Nazrin Massaro brings this action on behalf of herself and all others similarly situated against Defendants Beyond Meat, Inc., ("Beyond Meat"), and People for the Ethical Treatment of Animals, Inc., ("PETA"). Plaintiff alleges, on information and belief, except for information based on personal knowledge, as follows:

## **INTRODUCTION**

1.      This is a putative class action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*., ("TCPA"), arising from Defendants' violations of the TCPA

2.      Defendant Beyond Meat is a publicly traded company that develops and sells alternative animal food products made from protein isolate, rice and bean proteins, and various plant extracts.

3.      Defendant PETA is a non-profit animal rights organization.

4.      To promote Defendant Beyond Meat's products, Defendants engage in unsolicited text message advertising with no regard for consumers' privacy rights.

5.      Upon information and belief, Defendants caused thousands of text messages to be placed to the cellular telephones of Plaintiff and Class Members, causing them injuries.

6.      Through this action, Plaintiff seeks injunctive relief to halt Defendants' unlawful conduct. Plaintiff also seeks statutory damages on behalf of himself and the Class Members, as defined below, and any other available legal or equitable remedies resulting from the illegal actions of Defendants.

## **PARTIES**

7.      Plaintiff is, and at all times relevant hereto was, an individual and a "person" as defined by 47 U.S.C. § 153(39), a citizen and resident of San Diego County, California, and the subscriber and/or sole user of the cellular telephone number (858) ***-9991 (the "9991 Number").

8.     Defendant Beyond Meat is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 119 Standard Street, El Segundo, CA 90245.

9.     Defendant PETA is a non-profit corporation organized and existing under the laws of the State of Virginia with its principal place of business at 501 Front Street, Norfolk, VA 23510.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

11.     This Court has subject matter jurisdiction over this action pursuant to 47 U.S.C. § 227(b)(3).

12.     Defendant Beyond Meat is subject to general personal jurisdiction in California because Defendant's principal place of business is in California.

13.     Defendants are subject to specific personal jurisdiction in California because this suit arises out of and relates to Defendants significant contacts with this State.   Defendants initiated and directed, or caused to be initiated and directed, telemarketing and/or advertisement text messages into California in violation of the TCPA.

14.     Specifically, Defendants initiated and directed, or caused to be initiated and directed, the transmission of unsolicited advertisement or telemarketing text messages to the 9991 Number to sell products in California. The 9991 Number has an area code that specifically coincides with locations in California, and Plaintiff received such messages on the 9991 Number while residing in and physically present in California.

15.     Plaintiff's claims for violation of the TCPA against Defendants, and the resulting injuries caused to Plaintiff by Defendants' advertisement and telemarketing messages, which includes the invasion of Plaintiff's privacy, arose in substantial part from Defendants' direction of those messages into California.

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because a substantial part of Defendants' actions and omissions which gave rise to the claims asserted in this action occurred, in part, in this District.

## THE TCPA

17.     The TCPA prohibits: (1) any person from calling a cellular telephone number; (2) using an automatic telephone dialing system or an artificial or prerecorded voice; (3) without the recipient's prior express consent.  47 U.S.C. § 227(b)(1)(A).

18.     The TCPA further prohibits: (1) any person from initiating a call to any residential telephone line; (2) using an artificial or prerecorded voice; (3) without the recipient's prior express consent.  47 U.S.C. § 227(b)(1)(B).

19.     The TCPA defines an "automatic telephone dialing system" ("ATDS") as "equipment that has the capacity - (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

20.     The TCPA exists to prevent communications like the ones described within this Complaint.  *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

21.     In an action under the TCPA, a plaintiff must show only that the defendant "called a number assigned to a cellular telephone service using an automatic dialing system or prerecorded voice." *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012), *aff'd*, 755 F.3d 1265 (11th Cir. 2014).

22.     The Federal Communications Commission ("FCC") is empowered to issue rules and regulations implementing the TCPA.  According to the FCC's findings, calls in violation of the TCPA are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.  The

FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.

23.   In 2012, the FCC issued an order further restricting automated telemarketing calls, requiring "prior express written consent" for such calls. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830, 1838 ¶ 20 (Feb. 15, 2012) (emphasis supplied).

24.   To obtain express written consent for telemarketing calls, a defendant must establish that it secured the plaintiff's signature in a form that gives the plaintiff a "'clear and conspicuous disclosure' of the consequences of providing the requested consent….and [the plaintiff] having received this information, agrees unambiguously to receive such calls at a telephone number the [plaintiff] designates." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830, 1837 ¶ 18, 1838 ¶ 20, 1844 ¶ 33, 1857 ¶ 66, 1858 ¶ 71 (F.C.C. Feb. 15, 2012).

25.   The TCPA regulations promulgated by the FCC define "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(12).  In determining whether a communication constitutes telemarketing, a court must evaluate the ultimate purpose of the communication. *See Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015).

26.   "Neither the TCPA nor its implementing regulations 'require an explicit mention of a good, product, or service' where the implication of an improper purpose is 'clear from the context.'" *Id*. (citing *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012)).

27.   "'Telemarketing' occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services." *Golan*, 788 F.3d at 820 (citing 47 C.F.R. § 64.1200(a)(2)(iii) & 47 C.F.R. § 64.1200(f)(12));   *In re Rules and Regulations Implementing the Telephone*

*Consumer Protection Act of 1991*, 18 F.C.C. Rcd at 14098 ¶ 141, 2003 WL 21517853, at *49).

28.    The FCC has explained that calls motivated in part by the intent to sell property, goods, or services are considered telemarketing under the TCPA. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶¶ 139-142 (2003).  This is true whether call recipients are encouraged to purchase, rent, or invest in property, goods, or services during the call *or in the future*. *Id*.

29.    In other words, offers "that are part of an overall marketing campaign to sell property, goods, or services constitute" telemarketing under the TCPA. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶ 136 (2003).

30.    If a call is not deemed telemarketing, a defendant must nevertheless demonstrate that it obtained the plaintiff's prior express consent. *See In the Matter of Rules and Regulaions Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7991-92 (2015) (requiring express consent "for non-telemarketing and non-advertising calls").

31.    Further, the FCC has issued rulings and clarified that consumers are entitled to the same consent-based protections for text messages as they are for calls to wireless numbers. *See Satterfield v. Simon & Schuster, Inc*., 569 F.3d 946, 952 (9th Cir. 2009) ("The FCC has determined that a text message falls within the meaning of 'to make any call' in 47 U.S.C. § 227(b)(1)(A)").

1

**FACTS**

2      32.    Defendant PETA's annual revenue – primarily derived from corporate

3   contributions – was $50,871,312 in 2019.[2]

4      33.    A key component of Defendant PETA's revenue are its corporate

5   partnerships, including its "PETA Business Friends" program, described by

6   Defendant PETA as follows: "People for the Ethical Treatment of Animals (PETA)

7   is the largest animal rights organization in the world, with more than 6.5 million

8   members and supporters.  As a PETA Business Friend, your brand can connect with

9   our audience. **In return for a one-time donation, PETA will provide year-round**

10  **marketing benefits."[3]**

11     34.    Defendant PETA's "marketing benefits" include:

12        • **12 posts** to the PETA Mall <u>Twitter</u> and <u>Facebook</u>* pages

13

14        • A listing in **PETA's Annual Review**

15        • Opportunities to include items in **gift bags distributed at**

16          **PETA events** attended by influencers, celebrities, and our
            supporters and donors[4]

17     35.    The "marketing benefits" offered by Defendant PETA are more

18  specifically outlined below, and are tied to the amount contributed to Defendant

19  PETA:

20

21

22

23  _____

24  [2] <u>https://www.peta.org/about-peta/learn-about-peta/financial-report/</u>; (last accessed
    May 15, 2020).

25

26  [3] <u>https://www.peta.org/donate/ways-to-support-peta/peta-business-friends-about/</u>;
    (last accessed May 15, 2020) (emphasis original).

27

28  [4] *Id*.

## Silver ($500)

- Company name listed on PETABusinessFriends.com
- **Five** *PETA Prime E-News* features
- **Two** listings in PETA's <u>shopping guide e-news</u>

## Gold ($1,000)—*our most popular package!*

- Name and logo listed on PETABusinessFriends.com
- **10** *PETA Prime E-News* features
- **Five** features in PETA's <u>shopping guide e-news</u>
- **One** listing in PETA's <u>holiday shopping guide e-news</u>
- **2,000** company fliers or coupons distributed with PETA Shop fulfillment orders (when people make purchases from our online merchandise store)

## Platinum ($2,500)

- Company name and logo listed on PETABusinessFriends.com
- Placement on the homepage of the PETA Mall website
- **15** *PETA Prime E-News* features
- **Eight** spotlight features in PETA's <u>shopping guide e-news</u>
- **Two** listings in PETA's <u>holiday shopping guide e-news</u>
- **4,000** company fliers or coupons distributed with PETA Shop fulfillment orders (when people make purchases from our online merchandise store)
- **2,000** coupons distributed via enclosure in PETA's new-member welcome kits*

## Diamond ($5,000)

- Consideration for event sponsorship**
- A customized package that meets your needs[5]

---

[5] *Id.*

36.    Upon information and belief, prior to the transmission of the text messages at issue, Defendants entered into a corporate partnership agreement and/or arrangement pursuant to which Defendant PETA agreed to promote and provide marketing benefits to Defendant Beyond Meat in exchange for monetary contributions from Defendant Beyond Meat.

37.    Specifically, commencing on or about December 2013, Defendant PETA began to promote Defendant Beyond Meat's products, including naming Defendant Beyond Meat "PETA's Company of the Year!" and encouraging consumers to purchase Defendant Beyond Meat's products: "**If you haven't tried it yet, now's your chance! In honor of the award, the compassionate company is offering a** **coupon for** ***free*** **Beyond Meat strips.** This offer is available until December 25, so get yours today!"[6]

38.    For the past seven years, Defendant PETA has consistently promoted Defendant Beyond Meat's products through various channels including social media, the Internet, events, and mobile advertising, with one of the most recent advertisements, for example, attempting to convince consumers that "Beyond Meat's New Vegan Sausage Is the 'Missing Link' in Your Diet."[7]

39.    The following is an example of Defendant PETA's marketing of Defendant Beyond Meat's products on Defendant PETA's Instagram account:

---

[6] https://www.peta.org/blog/beyond-meat-company-2013/; (last accessed May 15, 2020) (emphasis original).

[7] https://www.peta.org/living/food/vegan-sausage-beyond-meat-new-product/; (last accessed May 15, 2020).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**View More on Instagram**

**10,733 likes**

**peta**

@BeyondMeat is debuting their new #vegan sausage at two @VeggieGrill locations in #LA, and you know we had to get there ASAP 🌭🏃💨 Watch our Story to (virtually) eat it with us 😋

view all 440 comments

FIRST AMENDED CLASS ACTION COMPLAINT

40.     Most recently, "PETA campus reps teamed up with innovative vegan food company Beyond Meat for an event titled 'Taste the Future'. In collaboration with university caterers, students at eight universities across the UK handed out plant-based Beyond Burgers to encourage passers-by to try an eco-friendly, animal-free meal."[8]

41.     In addition to providing marketing and promotional benefits, Defendant PETA has been instrumental in securing restaurant chain partnerships for Defendant Beyond Meat.  In a recent financial statement, Defendant PETA noted one example of its lobbying efforts: "Following talks and urging from PETA…Carl's Jr. and Del Taco added Beyond Meat products to their menus nationwide…"[9]

42.     In addition to Carl's Jr. and Del Taco, Defendant PETA has lobbied and secured product placement for Defendant Beyond Meat at Subway, Uno Pizzeria, and Dunkin Donuts, to name just a few.

43.     Pursuant to its partnership with Defendant Beyond Meat, Defendant PETA, on or about January 17, 2020, sent the following marketing text messages to Plaintiff's cellular telephone number ending in 9991 ("9991 Number"):

[8] https://www.tuco.ac.uk/insight/news-opinion/peta-teams-beyond-meat-invite-students-taste-future; (last accessed May 15, 2020).

[9] https://www.peta.org/wp-content/uploads/2020/03/PETA-FY19-Audited-Financial-Statements.pdf; (last accessed May 15, 2020).

Fri, Jan 17, 10:31 AM

DYK Beyond Meat is available at all On The Border locations? Yum! Be sure to order it at your local restaurant. <3 Melissa from PETA

DYK Beyond Meat is available at all On The Border locations? Yum! Be sure to order it at your local restaurant. <3 Melissa from PETA

44.    Upon information and belief, it was the intention of Defendants to act jointly and cooperatively in the promotion and marketing of Defendant Beyond Meat's products through the transmission of the above text messages.

45.    Upon information and belief, Defendant PETA's role was to provide marketing services for Defendant Beyond Meat, which included the text messages received by Plaintiff and Class Members.

46.    Upon information and belief, the subject text messages were sent for the benefit of Defendants, i.e., to promote Defendant Beyond Meat's products from which Defendant Beyond Meat earns a profit that it then contributes back to Defendant PETA.

47.    Upon information and belief, Defendant Beyond Meat was aware and understood that Defendant PETA's marketing benefits for Defendant Beyond Meat's products would include the transmission of the text messages.

48.    Upon information and belief, Defendant PETA's acts complained of herein were known, consented to, and/or ratified by Defendant Beyond Meat. Further, Defendant Beyond Meat knowingly received and retained monetary benefit from Defendant PETA's unlawful telemarketing practices alleged herein.

49.    Plaintiff is the subscriber and/or sole used of the 9991 number.

FIRST AMENDED CLASS ACTION COMPLAINT

50.    The text messages received by Plaintiff originated from a telephone number which is owned and/or operated by or on behalf of Defendant PETA.

51.    The purpose of the subject text messages was to market Defendant Beyond Meat's goods, as is plainly evident from the content of the messages.

52.    Upon information and belief, Defendant PETA caused similar text messages to be placed to individuals residing within this judicial district and nationally.

53.    At no point in time did Plaintiff provide Defendants with express <u>written</u> consent to be contacted by Defendants with automated advertising text messages.

54.    Indeed, Plaintiff previously provided express consent (not express <u>written</u> consent) to Defendant PETA for purposes of receiving informational non-advertising text messages.  Prior to transmitting the subject text messages, Defendant PETA failed to secure express written consent and exceeded the scope of the prior express consent provided by Plaintiff.

55.    While Defendant PETA, as a non-profit organization, would typically not be subject to the FCC's express written consent rule, it is in this case because it was acting as a conduit for Defendant Beyond Meat, a for profit corporation, and because it was engaged in marketing Defendant Beyond Meat's products.

56.    The generic nature of the subject text messages demonstrates that Defendant PETA utilized an ATDS in transmitting the messages.

57.    In fact, on its own website, Defendant PETA admits to utilizing an "Automatic Telephone Dialing System (ATDS)" when transmitting text messages.[10]

58.    The number (738-22) utilized to transmit the above text messages to Plaintiff is known as a "short-code."   Short-codes are short digit sequences, significantly shorter than telephone numbers, that are used to address messages in the

---

[10] *See* <u>https://www.peta.org/about-peta/learn-about-peta/website-policies/texting-terms-and-conditions/</u>; (last accessed May 15, 2020).

Multimedia Messaging System and short message service systems of mobile network operators.

59.     Short codes cannot be used to transmit text messages from a traditional or cellular telephone.  Only computer systems can transmit text messages using a short-code.

60.     To send the text message, Defendant PETA used a messaging platform (the "Platform") that permitted Defendants to transmit thousands of automated text messages without any human involvement.

61.     Upon information and belief, the Platform has the capacity to store telephone numbers.

62.     Upon information and belief, the Platform has the capacity to generate sequential numbers.

63.     Upon information and belief, the Platform has the capacity to dial numbers in sequential order.

64.     Upon information and belief, the Platform has the capacity to dial numbers from a list of numbers.

65.     Upon information and belief, the Platform has the capacity to dial numbers without human intervention.

66.     Upon information and belief, the Platform has the capacity to schedule the time and date for future transmission of text messages, which occurs without any human involvement.

67.     Upon information and belief, the Platform has an auto-reply function that allows the Platform to transmit automated text message replies without any human intervention.

68.     Upon information and belief, to transmit the messages at issue, the Platform automatically executed the following steps:

        a.   The Platform retrieved each telephone number from a list of numbers in the sequential order the numbers were listed;

b. The Platform then generated each number in the sequential order listed and combined each number with the content of Defendant's message to create "packets" consisting of one telephone number and the message content;

c. Each packet was then transmitted in the sequential order listed to an SMS aggregator, which acts an intermediary between the Platform, mobile carriers (e.g. AT&T), and consumers.

d. Upon receipt of each packet, the SMS aggregator transmitted each packet – automatically and with no human intervention – to the respective mobile carrier for the telephone number, again in the sequential order listed by Defendant. Each mobile carrier then sent the message to its customer's mobile telephone.

69.    The above execution these instructions occurred seamlessly, with no human intervention, and almost instantaneously. Indeed, upon information and belief, the Platform is capable of transmitting thousands of text messages following the above steps in minutes, if not less.

70.    The following graphic summarizes the above steps and demonstrates that the dialing of the text messages at issue was done by the Platform automatically and without any human intervention:



71.    Defendants' unsolicited text messages caused Plaintiff actual harm, including invasion of his privacy, aggravation, annoyance, intrusion on seclusion,

trespass, and conversion.  Defendants' text messages also inconvenienced Plaintiff and caused disruption to his daily life.

## CLASS ALLEGATIONS

### PROPOSED CLASS

72.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23, on behalf of himself and all others similarly situated.

73.     Plaintiff brings this case on behalf of the below defined Class:

> **All persons within the United States who, within the four years prior to the filing of this Complaint, were sent a text message using the same type of equipment used to text message Plaintiff, promoting Defendant Beyond Meat's goods, from Defendants or anyone on Defendants' behalf, to said person's cellular telephone number.**

74.      Defendants and their employees or agents are excluded from the Class. Plaintiff does not know the number of members in the Class but believes the Class members number in the several thousands, if not more.

### NUMEROSITY

75.     Upon information and belief, Defendants have placed calls to telephone numbers belonging to thousands of consumers throughout the United States without their prior express consent.  The members of the Class, therefore, are believed to be so numerous that joinder of all members is impracticable.

76.     The exact number and identities of the Class members are unknown at this time and can be ascertained only through discovery.  Identification of the Class members is a matter capable of ministerial determination from Defendants' call records.

## COMMON QUESTIONS OF LAW AND FACT

77.     There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class.  Among the questions of law and fact common to the Class are:

(1) Whether Defendants made non-emergency calls to Plaintiff and the class members' cellular telephones using an ATDS;

(2) Whether Defendants can meet their burden of showing that they obtained prior express written consent to make such calls;

(3) Whether Defendants' conduct was knowing and willful;

(4) Whether Defendants are liable for damages, and the amount of such damages; and

(5) Whether Defendants should be enjoined from such conduct in the future.

78.     The common questions in this case are capable of having common answers. If Plaintiff's claims that Defendants routinely transmit text messages to telephone numbers assigned to cellular telephone services are accurate, Plaintiff and the Class members will have identical claims capable of being efficiently adjudicated and administered in this case.

## TYPICALITY

79.     Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories.

## PROTECTING THE INTERESTS OF THE CLASS MEMBERS

80.     Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class and has retained competent counsel. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

### SUPERIORITY

81.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendant's wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

82.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another may not.  Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

### COUNT ONE
### Violation of the TCPA, 47 U.S.C. § 227
### (On behalf of Plaintiff and the Class)

83.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 82 of this Complaint and incorporates them by reference herein.

84.     It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system … to any telephone number assigned to a … cellular telephone service …." 47 U.S.C. § 227(b)(1)(A)(iii).

85.     The TCPA defines an "automatic telephone dialing system" (hereinafter "ATDS") as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id*. at § 227(a)(1).

86.     Defendant PETA – or third parties directed by Defendant PETA – used equipment having the capacity to store telephone numbers, using a random or sequential generator, and to dial such numbers and/or to dial numbers from a list automatically, without human intervention, to make non-emergency telephone calls to the cellular telephones of Plaintiff and the other members of the Class.

87.     These calls were made without regard to whether Defendants had first obtained express <u>written</u> consent from the called party to make such calls. In fact, Defendants did not have prior express written consent to call the cell phones of Plaintiff and the other members of the putative Class when its calls were made.

88.     Defendant Beyond Meat is vicariously liable and/or liable as a joint venturer for Defendant PETA's conduct.  *See Klein v. Just Energy Grp., Inc.*, Civil Action No. 14-1050, 2016 U.S. Dist. LEXIS 84447, at *27 (W.D. Pa. June 29, 2016) (citing *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 674 (2016) ("The United States Supreme Court in *Campbell-Ewald Co. v. Gomez* held that a party may be liable under the TCPA in accordance with tort-related vicarious liability rules.")); *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois, N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C.R. 6574, 6588 (2013); *Cellco P'ship v. Plaza Resorts Inc.*, No. 12-81238-CIV, 2013 WL 5436553, at *6 (S.D. Fla. Sept. 27, 2013); *Keim v. ADF Midatlantic, Ltd. Liab. Co.*, No. 12-80577-CIV, 2015 U.S. Dist. LEXIS 159070 (S.D. Fla. Nov. 9, 2015) (denying motion to dismiss TCPA complaint, and holding that plaintiff sufficiently alleged a theory of joint venture); *Mey v. Honeywell Int'l, Inc.*, Civil Action No. 2:12-1721, 2013 U.S. Dist. LEXIS 45265 (S.D. W. Va. Mar. 29, 2013) (same); *Newbold v. State Farm Mut. Auto. Ins. Co.*, No. 13 C 9131, 2015 U.S. Dist. LEXIS 194101 (N.D. Ill. Jan. 23, 2015) (denying motion to dismiss TCPA claim and holding that "[t]o the extent that partners or joint venturers are pursuing the objectives of their mutual enterprise, they can be deemed agents of that enterprise.").

89.     Thus, Defendants violated § 227(b)(1)(A)(iii) of the TCPA by using an automatic telephone dialing system to make non-emergency telephone calls to the cell phones of Plaintiff and the other members of the putative Class without their prior express consent.

90.     As a result of Defendants' conduct and pursuant to § 227(b)(3) of the TCPA, Plaintiff and the other members of the putative Class were harmed and are each entitled to a minimum of $500.00 in damages for each violation. Plaintiff and the class are also entitled to an injunction against future calls.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Nazrin Massaro, on behalf of herself and the Class, prays for the following relief:

1.     An order certifying the Class as defined above;

2.     An award of actual and statutory damages, where appropriate;

3.     Punitive or treble damages according to statute or where otherwise appropriate;

4.     An injunction requiring Defendants to cease all wireless spam activities;

5.     An award of reasonable attorneys' fees and costs; and

6.     Such further and other relief the Court deems reasonable and just.

## **JURY DEMAND**

Plaintiff hereby requests trial by jury of all claims that can be so tried.

FIRST AMENDED CLASS ACTION COMPLAINT

Date: May 15, 2020

Respectfully submitted,

**HIRALDO P.A.**

By:   */s/ Manuel S. Hiraldo*
Manuel S. Hiraldo, Esq.
(*pro hac vice*)
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, Florida 33301
mhiraldo@hiraldolaw.com
(t) 954.400.4713

**NICHOLAS & TOMASEVIC, LLP**
Craig M. Nicholas (SBN 178444)
Alex M. Tomasevic (SBN 245598)
225 Broadway, 19th Floor
San Diego, California 92101
Telephone: (619) 325-0492
Facsimile: (619) 325-0496
Email: cnicholas@nicholaslaw.org
Email: atomasevic@nicholaslaw.org

*Counsel for Plaintiff*

FIRST AMENDED CLASS ACTION COMPLAINT