1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT
9            SOUTHERN DISTRICT OF CALIFORNIA
10

11   NAZRIN MASSARO, on behalf of            Case No.:  3:20-cv-00510-AJB-MSB
     herself and all others similarly situated,
12                                Plaintiff,   **ORDER:**
13   v.
                                              **(1) DENYING PETA'S MOTION TO**
14   BEYOND MEAT, INC., and PEOPLE            **STAY, (Doc. No. 24);**
     FOR THE ETHICAL TREATMENT OF
15   ANIMALS, INC.,                           **(2) DENYING PETA'S MOTION TO**
16                                Defendants.  **DISMISS OR STRIKE, (Doc. No. 29);**
17
                                              **(3) DENYING PETA'S MOTION TO**
18                                            **DISMISS FOR LACK OF**
19                                            **JURISDICTION, OR**
                                              **ALTERNATIVELY, FOR FAILURE**
20                                            **TO STATE A CLAIM, (Doc. No. 30);**
21
                                              **(4) DENYING AS MOOT BEYOND**
22                                            **MEAT'S MOTION TO DISMISS OR**
23                                            **STAY, (Doc. No. 33);**
24
                                              **(5) GRANTING PETA'S MOTION TO**
25                                            **STAY, (Doc. No. 46); AND**
26
                                              **(6) DENYING PETA'S MOTION TO**
27                                            **DISMISS FOR LACK OF**
                                              **JURISDICTION, (Doc. No. 65)**
28

1

Before the Court are several motions: (1) Defendant People for the Ethical Treatment of Animals, Inc.'s ("PETA") motion to stay pending the FCC's definition of an ATDS, (Doc. No. 24); (2) PETA's motion to dismiss or strike Plaintiff Nazrin Massaro's ("Plaintiff") nationwide class claims, (Doc. No. 29); (3) PETA's motion to dismiss Plaintiff's First Amended Complaint ("FAC") for lack of subject matter jurisdiction under Article III of the U.S. Constitution, or alternatively, for failure to state a claim, (Doc. No. 30); (4) dismissed Defendant Beyond Meat, Inc.'s motion to dismiss, or in the alternative, stay proceedings, (Doc. No. 33); (5) PETA's motion to stay pending the Supreme Court's decision in *Facebook, Inc. v. Duguid*, (Doc. No. 46); and (6) PETA's motion to dismiss for lack of subject matter jurisdiction pursuant to the Supreme Court's decision in *Barr v. AAPC*, (Doc. No. 65). Plaintiff opposed each motion. (Doc. Nos. 28, 41, 42, 50, 71.) The United States of America intervened in this action to defend the constitutionality of the TCPA against assertions that the "robocall restriction" provision, 47 U.S.C. § 227(b)(1)(A)(iii), violates the First Amendment, on its face and as applied. (Doc. No. 90–91.)

Pursuant to Civil Local Rule 7.1.d.1, the Court finds the instant matter suitable for determination on the papers and without oral argument. As such, the Court **VACATES** the March 25, 2021 hearing on PETA's motion to dismiss for lack of subject matter jurisdiction. For the reasons set forth in detail below, the Court **GRANTS** PETA's motion to stay this litigation pending the United States Supreme Court's decision in *Facebook, Inc. v. Duguid*. All other motions based on other grounds are **DENIED**.

## I.   BACKGROUND

This is a putative class action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*, ("TCPA"). Beyond Meat[1] is a publicly traded company that develops

---

[1] Beyond Meat, Inc. was originally named as a defendant in this action. However, on June 8, 2020, Plaintiff voluntarily dismissed Beyond Meat from the lawsuit. (Doc. No. 40.) Before this dismissal, Beyond Meat had filed a motion to dismiss, or in the alternative, stay proceedings. (Doc. No. 33.) Because Beyond Meat has already been dismissed from this action, this motion is **DENIED AS MOOT**.

2

and sells alternative animal food products made from protein isolate, rice and bean proteins, and other various plant extracts. (First Amended Complaint ("FAC") ¶ 2.) Plaintiff alleges Beyond Meat entered into a corporate partnership agreement and/or arrangement pursuant to which Defendant PETA, a non-profit animal rights organization, agreed to promote and provide marketing benefits to Beyond Meat in exchange for monetary contributions from Beyond Meat. (*Id.* ¶ 36.)

On or about January 17, 2020, pursuant to an alleged partnership with Beyond Meat, PETA sent the following marketing text messages to Plaintiff's cellular telephone number ending in 9991 ("9991 Number"):



Plaintiff's core allegation is that PETA sent her a text message via an ATDS without sufficient prior express written consent in violation of the TCPA. Plaintiff maintains at no point in time did Plaintiff provide Beyond Meat or PETA with express **written** consent to be contacted with automated advertising text messages. Plaintiff maintains she only provided express consent to PETA for the purposes of receiving informational non-advertising text messages. (*Id.* ¶ 53–54.) Furthermore, Plaintiff contends, "[t]he generic nature of the subject text messages demonstrates that Defendant PETA utilized an ATDS in transmitting the messages." (*Id.* ¶ 56.) Plaintiff seeks to represent a nationwide class of all individuals who received a similar message and seeks statutory penalties of $500 per message received by each putative class member of her alleged nationwide class. (*Id.* ¶ 90.) //

3

## II.   DISCUSSION

Defendant PETA filed numerous motions in this action. The Court will first address PETA's motions involving this Court's jurisdiction to hear the case. Concluding that this Court has jurisdiction, the Court will turn to whether the nationwide class claims may be properly dismissed at this stage. Lastly, the Court will determine whether a stay is warranted.

### A.   PETA's Motion to Dismiss for Lack of Standing (Doc. No. 30)

First, PETA moves under Federal Rule of Civil Procedure[2] 12(b)(1) to dismiss the matter for lack of Article III standing. (Doc. No. 30-1 at 13.) For two reasons, PETA argues Plaintiff cannot show an actual injury-in-fact sufficient to confer Article III standing. First, "the single text message was not sent for a marketing purpose and did not invade Plaintiff's privacy sufficient to cause actual injury." (*Id.* at 7.) Second, because Plaintiff consented to the text message, it was not unsolicited and could not have invaded her privacy, at least not sufficient for Article III standing. (*Id.*) The Court addresses both arguments below, and concludes that Plaintiff has standing to bring this claim.

Standing under Article III pertains to the Court's subject matter jurisdiction and therefore is "properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). The standing to sue doctrine is derived from Article III of the Constitution's limitation of the judicial power of federal courts to "actual cases or controversies." *Spokeo v. Robins*, 136 S.Ct. 1540, 1547 (2016) (citing *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* Rule 12(b)(1) challenges to this Court's jurisdiction may be facial or factual. *See White*, 227 F.3d at 1242. "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By

---

[2] Unless otherwise noted herein, all references to "Rule" is to the Federal Rules of Civil Procedure.

contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Here, PETA argues that under either attack, Plaintiff lacks Article III standing to bring her claim. (Doc. No. 30-1 at 12.)

To establish standing, a plaintiff must show she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547. These elements are referred to as injury-in-fact, causation, and redressability. *See Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020). All three are necessary. *See id.* PETA challenges the injury-in-fact requirement. (Doc. No. 30-1 at 15.) "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1538.

### 1. PETA's Argument That A Single Text Message Was Sent for A Non-Marketing Purpose

#### a) Whether a Single Text Message May Constitute an Injury-in-Fact

Addressing PETA's first point, PETA argues Plaintiff's receipt of a single non-telemarketing text message does not constitute an injury-in-fact sufficient to confer Article III standing. (Doc. No. 30-1 at 15.) In support of PETA's position that a single text may not constitute an injury, PETA cites to the Eleventh Circuit's decision in *Salcedo v. Hanna*, wherein the court held that a text message is akin to "having a flyer briefly waived in one's face . . . [a]nnoying, perhaps, but not a basis for invoking the jurisdiction of the federal courts." 936 F.3d 1162, 1172 (11th Cir. 2019). In opposition, Plaintiff argues PETA violated Plaintiff's substantive rights under the TCPA and Plaintiff is not required to show any additional harm. (Doc. No. 42 at 13.) Plaintiff asserts she previously provided her telephone number to PETA only "for purposes of receiving informational non-advertising

5

text messages," and "did not provide her telephone number to Defendant for purposes of receiving any advertisements or telemarketing." (*Id.*)

Notwithstanding PETA's citation to Eleventh Circuit authority in *Salcedo*, PETA also admits that the leading authority in the Ninth Circuit is *Van Patten v. Vertical Fitness Grp.*, 847 F.3d 1037 (9th Cir. 2017). Notably, *Salcedo* distinguishes *Van Patten* by noting that "our sister circuit has reached the opposite conclusion in this context." 936 F.3d at 1170 (citing *Van Patten*, 847 F.3d at 1043). In *Van Patten*, the Ninth Circuit held that telephone calls or text messages from a telemarketer is sufficient to satisfy Article III's injury-in-fact requirement. In the case, the plaintiff provided his cellphone number to a gym in the process of signing up for a gym membership. *See* 847 F.3d 1037, 1040 (9th Cir. 2017). After the plaintiff cancelled his membership, the gym texted the plaintiff to offer him a special deal to rejoin the gym. *Id.* at 1041. The Ninth Circuit panel held that Congress established the TCPA to protect the plaintiff's substantive right to privacy, namely the right to be free from unsolicited telemarketing phone calls or text messages that "invade the privacy and disturb the solitude of their recipients." *Id.* at 1043. Therefore, "a violation of the TCPA is a concrete, de facto injury." *Id.* Significantly, the court stated "*a*" violation of the TCPA is sufficient. Moreover, the court noted "a plaintiff alleging a violation under the TCPA 'need not allege any additional harm beyond the one Congress identified,'" which is that she received an unsolicited text message or telephone call from a telemarketer. *Id.* (quoting *Spokeo II*, 136 S. Ct. at 1549).

As a preliminary note, there is a dispute between the parties as to whether one or two text messages were sent to Plaintiff. (*Compare* Doc. No. 30-1 at 16 ("Here, Plaintiff received one text message from PETA on January 17, 2020. . . ." *with* Doc. No. 42 at 10 ("Defendant sent the following two text messages to Plaintiff's cellular telephone. . . .").) While technically two separate text messages were sent, the two text messages appear to be identical, and sent simultaneously. But regardless of whether PETA's text message to Plaintiff qualified as a single text message or two separate text messages, the Ninth Circuit's decision in *Van Patten* forecloses PETA's argument that a single text message

6

may not constitute a TCPA violation. Accordingly, the TCPA claim will not be dismissed on this basis alone. *See Aleisa v. Square, Inc.*, No. 20-CV-00806-EMC, 2020 WL 5993226, at *4 (N.D. Cal. Oct. 9, 2020) (rejecting argument that a single text message may not rise to the level of a TCPA violation).

### b)   Whether a Non-Telemarketing Text Message May Constitute an Injury-in-Fact

In a related argument, PETA maintains there is no standing because the single text message was not sent ***for a telemarketing benefit***. (Doc. No. 30-1 at 17.) It is PETA's position that it sent one text message only to further its non-profit, charitable mission— "Animals are not ours to . . . eat . . ."—by encouraging a vegan diet. (*Id.*) PETA argues it did not send the text message on behalf of, or at the direction of Beyond Meat, and it did not send this text message for any economic benefit. (*Id.*)

At this point of the litigation, a "[j]urisdictional finding of genuinely disputed facts is inappropriate when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action." *Sun Valley Gas., Inc. v. Ernst Enters.*, 711 F.2d 138, 140 (9th Cir. 1983)). Such is the case here. While Plaintiff argues the subject text messages were sent on behalf of Beyond Meat pursuant to a marketing arrangement, (FAC ¶ 43), PETA asserts it never entered into a corporate partnership agreement with Beyond Meat to send the text message, (Declaration of Jeffrey S. Kerr ("Kerr Decl.") ¶ 10). The three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs.*, LLC, 707 F.3d 1036, 1043 (9th Cir. 2012). Text messages are considered "calls" under the TCPA. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). As to the third element, consent is an affirmative defense on which the defendant bears the burden of proof. *See Van Patten*, 847 F.3d at 1044. The type of consent required depends on the content of the message. If the text message "includes or introduces an advertisement or constitutes telemarketing," the sender is

7

1   required to obtain "prior express written consent" of the recipient. *See* 47 C.F.R. at

2   §§ 64.1200(a)(1) and (2).

3       Whether the text message was sent for a commercial purpose or not is thus squarely

4   intertwined with whether there was a TCPA violation in the first instance. *See Satterfield v.*

5   *Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009). At this time, the Court cannot resolve

6   PETA's attack on the Court's jurisdiction without also deciding the merits of Plaintiff's

7   TCPA claim. *See Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 978 (N.D.

8   Cal. 2019) (explaining that the court previously denied a Rule 12(b)(1) motion to dismiss

9   because "there are factual issues in dispute that cannot be determined based upon the record

10  here"). This is a key factual dispute going to the merits and not appropriate for resolution

11  as a standing question. *See Aleisa*, 2020 WL 5993226, at *5 (denying Rule 12(b)(1) motion

12  to dismiss in TCPA matter based on entanglement of jurisdictional dispute and merits).

13      **2.    PETA's Argument That Plaintiff Consented to the Text Message**

14      As the second grounds for this motion, PETA argues Plaintiff cannot prove actual

15  injury-in-fact based on the receipt of a text message that she consented to receive. (Doc.

16  No. 30-1 at 17.) PETA points out that Plaintiff admits she "previously provided express

17  consent" to PETA to receive text messages. (FAC ¶ 54.) In rebuttal, Plaintiff states that

18  while she provided express consent, she did not provide express ***written*** consent to be

19  contacted with advertising and telemarketing. (Doc. No. 42 at 17.) It is inappropriate to

20  address this argument in the context of a motion to dismiss for lack of standing. Indeed,

21  "the question of the recipient's consent bears not on the plaintiff's standing, but on the

22  separate inquiry into whether the defendant is able to establish an affirmative defense of

23  consent." *Daniel v. Lennar Corp.*, No. 819CV00452JLSDFM, 2019 WL 8194735, at *3

24  (C.D. Cal. Oct. 16, 2019). Accordingly, this contention is more properly addressed as a

25  question going to the merits of Plaintiff's claim.

26                                   * * *

27      In summation, Plaintiff has sufficiently alleged standing by the assertion that she

28  received a telemarketing text message without her express written consent, in violation of

8

the TCPA. PETA's motion to dismiss based on this ground is **DENIED**.

## B.    PETA's Motion to Dismiss for Failure to State a Claim (Doc. No. 30)

PETA next argues that should the Court decline to dismiss this action for lack of subject matter jurisdiction, the Court should nevertheless dismiss the FAC for failing to state a claim under Rule 12(b)(6). In particular, PETA argues that under the FCC's exemption for non-profits, PETA cannot be held liable for the subject text message because (1) PETA is a non-profit organization, and (2) Plaintiff provided "prior express consent" to be texted. (Doc. No. 30-1 at 21–22.) PETA claims that because it is a non-profit, it did not need prior express *written* consent, even if the text message was considered advertising or telemarketing. (*Id.*) In opposition, Plaintiff argues that PETA should not be permitted to avail itself of the exemption even when engaging in commercial activities. (Doc. No. 42 at 22.) As set forth below, Plaintiff's position is persuasive.

The TCPA makes it "unlawful for any person within the United States . . . to make any call (other than a call . . . made with the prior express consent of the called party) . . . using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii). Generally, for non-marketing messages, only prior express consent is required. *See* In the Matter of Rules & Regulations Implementing the Tel. Customer Prot. Act of 1991, 30 FCC Rcd. 7961, 8029 ¶ 141 & n.481 (July 10, 2015) ("[P]ersons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given.").

Under its Telemarketing Rule, the FCC has imposed a more stringent "prior express *written* consent" requirement for calls or texts that constitute marketing. *See* 47 C.F.R. § 64.1200(a)(2); *see also Van Patten*, 847 F.3d at 1044. For such "written consent," the FCC requires a clear and conspicuous signed, written agreement to receive automated calls and a disclosure that such consent is not a condition of any good or service. *See* 47 C.F.R. § 64.1200(a)(2). The FCC, however, has exempted non-profits from the prior express written consent requirement applicable to marketing messages. Indeed, the FCC

9

regulations provide:

> "No person or entity may: . . . Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice . . . [to a cell phone] . . . other than a call made with the prior express written consent of the called party or the prior express consent of the called party *when the call is made by or on behalf of a tax-exempt nonprofit organization* . . . ."

47 C.F.R. § 64.1200(a)(2) (emphasis added). The FCC recognized that many non-profit organizations send messages that are not commercial in nature and are therefore not "advertisements." Under the TCPA, telemarketing calls from non-profit organizations are by definition, non-commercial. *See* In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 7 FCC Rcd. 8752, 8773–74 (1992) ("[W]e conclude that tax-exempt nonprofit organizations should be exempt from the prohibition on prerecorded message calls to residences as non-commercial calls.").

Here, PETA appears to argue there is a blanket exemption for non-profit organizations, (Doc. No. 30-1 at 19–22), while Plaintiff contends PETA's text messaging campaign amounts to a commercial advertising endeavor masquerading as charitable communication, (Doc. No. 42 at 23). The issue therefore turns on whether PETA is shielded from liability regardless of the content of the allegedly offending text message. On the one hand, PETA's text message notifying recipients of the availability of a meat alternative product at a certain restaurant is certainly related to PETA's mission of encouraging a vegan diet. But equally compelling is the argument that the text message was sent to encourage the purchase of a for-profit corporation's product.

The Court is not aware of any court in the Ninth Circuit expressly addressing this issue. However, persuasive federal case law, the FCC regulations, and the legislative history help guide this Court to its conclusion that the non-profit exemption does not apply to these facts at this stage. First, other federal courts have touched on this subject in a way helpful to this Court's analysis. In the motion for summary judgment context in *Aranda v.*

10

*Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817 (N.D. Ill. 2016), the court grappled with a non-profit exemption under Section 64.1200(a)(2). While the non-profit exemption was different, the reasoning applies similarly. The court noted that if a tax-exempt non-profit entity was acting on its own behalf, the exemption would absolve the non-profit of liability for the calls. *See* 179 F. Supp. 3d 817, 828. But the court further noted that it was not clear at that stage of the litigation that the non-profit made the calls on its own behalf or "rather did so as an agent" of other defendants. *Id.* If the nonprofit was acting as a "conduit for [the other for-profit defendants] to solicit business and generate profit, then the calls can hardly be said to have been made 'by or on behalf of a tax-exempt nonprofit organization.'" *Id.* Thus, the court held that "[b]ecause a reasonable jury could find that [the nonprofit] was acting on its own and without the authorization of [the other for-profit defendants], the Court cannot say at this juncture whether the exemptions contained in sections 64.1200(a)(3)(ii) and 64.1200(a)(3)(iv) might shield defendants from liability." *Id.*

Second, the FCC regulations demonstrate that this question is not as clear cut as argued by PETA. By the plain terms of the FCC regulations, non-profits are shielded from liability under the non-profit exemption as a categorical matter ***if*** the nonprofit is promoting ***its own*** products or services. *See* In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 FCC Rcd. 14014, 14089 (2003). As stated in the regulations, "[c]onsistent with section 227, a tax-exempt nonprofit organization that conducts ***its own*** fundraising campaign or hires a professional fundraiser to do it, will not be subject to the restrictions on telephone solicitations." *Id.* While the regulations make clear that a blanket exemption exists if a non-profit is promoting its own organization, there is not the same clarity when the subject call/text involves a for-profit entity. For example, in its 2003 Report and Order, the FCC confronted complaints that the "[nonprofit exemption] frequently has been used to veil what is in reality a commercial venture." FCC 2003 Report & Order, 18 FCC Rcd. 14014, 14088 ¶ 127. In light of this concern, the FCC issued a clarification of the non-profit exemption: "[i]f . . . a for-profit organization is delivering its own commercial message as part of a telemarketing campaign (i.e.,

11

encouraging the purchase or rental of, or investment in, property, goods, or services), even if accompanied by a donation to a charitable organization or referral to a tax-exempt nonprofit organization, that call is not by or on behalf of a tax-exempt nonprofit organization." *Id.* at 14089 ¶ 128. Thus, the FCC regulations shed light on the concern for the use of the non-profit exemption to conceal for what is in fact a commercial scheme.

Third, the legislative history confirms that Congress' decision to exclude non-profit organizations from the definition of "telemarketing" in the TCPA was related to Congress' belief that calls from non-profits tend to be less intrusive. In the House Report No. 102–317, the House Committee on Energy and Commerce stated, "the record suggests that most unwanted telephone solicitations are commercial in nature. . . . [T]he Committee also reached the conclusion, based on the evidence, that . . . calls [from tax-exempt nonprofit organizations] are less intrusive to consumers because they are more expected. Consequently, the two main sources of consumer problems—high volume of solicitations and unexpected solicitations—are not present in solicitations by nonprofit organizations." H.R. Rep. No. 102-317 at 16. Thus, an interpretation of the non-profit exemption in a way that would tend to frustrate Congress' intent would be improper.

Based on the foregoing authority, the Court finds the non-profit exemption inapplicable to PETA at the motion to dismiss stage. Construing the facts alleged in the Complaint as true, and viewing them in a light most favorable to Plaintiff, it appears the subject text messages was made with dual commercial and non-commercial purpose. Plaintiff's allegations provide that PETA, as a nonprofit, was acting as a conduit for Beyond Meat in advertising the availability of the alternative meat product at a certain restaurant. (FAC ¶ 55.) Specifically, the FAC offers that "[a] key component of Defendant PETA's revenue are its corporate partnerships, including its "PETA Business Friends" program. (*Id.* ¶ 33.) Plaintiff explains PETA and Beyond Meat "entered into a corporate partnership agreement and/or arrangement pursuant to which Defendant PETA agreed to promote and provide marketing benefits to Defendant Beyond Meat in exchange for monetary contributions from Defendant Beyond Meat." (*Id.* ¶ 36.) In further support of this

12

contention, Plaintiff outlines that the PETA's and Beyond Meat relationship dates as far back as December 2013, when PETA began to promote Defendant Beyond Meat's products. (*Id.* ¶ 37.) Although PETA denies the allegations that it received compensation from Beyond Meat, (Doc. No. 30-1 at 11), the Court is obligated to take Plaintiff's word at face value at this stage. Thus, if PETA was indeed acting as a "conduit for [Beyond Meat] to solicit business and generate profit, then the calls can hardly be said to have been made 'by or on behalf of a tax-exempt nonprofit organization.'" *Aranda*, 179 F. Supp. 3d 817.

This conclusion also comports with the FCC's concern that the non-profit exemption may serve as an end-run around the prior express written consent requirement, particularly in cases where the subject texts or calls contain a commercial message. Here, a reading of the FAC reveals a plausible claim that PETA was simultaneously promoting its organizational mission, along with a for-profit corporation's product. Furthermore, adopting PETA's view of a blanket exemption for non-profits would not be consistent with the spirit of the TCPA in maintaining privacy, and safeguarding citizens against a high volume of unexpected calls.

Accordingly, while it is possible that further litigation will reveal that the subject text message was not sent with a commercial purpose, for now, PETA's Rule 12(b)(6) motion to dismiss based on the non-profit exemption is **DENIED**.

## C. PETA's Motion to Dismiss for Lack of Jurisdiction Based On Constitutionality (Doc. No. 65)

Next, PETA moves to dismiss the action for lack of jurisdiction based on two grounds. First, PETA argues the United States Supreme Court recently held in *AAPC v. FCC* that a relevant provision of the TCPA was unconstitutional during the time Plaintiff received the at-issue text messages, (Doc. No. 65-1 at 5). Second, PETA challenges the application of the TCPA as an unconstitutional restriction on free speech. (Doc. No. 65-1 at 18.) In response, Plaintiff characterizes PETA's argument as an attempt to "ride a discrete constitutional flaw in [the TCPA] to take down the whole, otherwise constitutional statute." (Doc. No. 71 at 7.) The United States of America also intervened to defend the

13

constitutionality of the TCPA. (Doc. No. 91.)

>    **1.    Whether This Court Lacks Jurisdiction Based on *Barr v. AAPC***

First, PETA argues the Supreme Court's decision in *Barr v. AAPC* ("*AAPC*") deprives this Court of jurisdiction because the decision found the TCPA unconstitutional between 2015 (when the TCPA was amended to add an unconstitutional provision) to 2020 (the year the *AAPC* opinion was issued). (Doc. No. 65-1 at 5.) Because the text message at issue was sent during this time in question, PETA essentially contends it cannot be held liable for any TCPA violation. (*Id.* at 13.) Plaintiff disagrees, asserting that only one provision, not at issue in this case, offended the Constitution and this provision was severed from the rest of the TCPA. (Doc. No. 71.) The Court agrees with Plaintiff's position.

As background, Congress first enacted the TCPA in 1991 in response to the rise of intrusive robocalls. In 2015, the TCPA was amended to create a "government-debt" exception to allow calls made to collect a debt owed to or guaranteed by the United States government. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301(a)(1)(A), 129 Stat. 584, 588 (amending 47 U.S.C. § 227(b)(1)(A)(iii)). This government-debt exception was challenged in 2016 as a violation of the First Amendment. *See AAPC v. Sessions*, 323 F. Supp. 3d 737 (E.D.N.C. 2018). Plaintiffs in the district court argued that the government-debt exception was an unconstitutional content-based restriction on speech because the government-debt exception favors commercial speech over political speech. *Id.* at 741. The matter eventually reached the United States Supreme Court, which granted certiorari to determine: (1) whether the government-debt exception violates the First Amendment, and (2) whether the proper remedy for any constitutional violation was to sever the exception from the remainder of the statute. *See Barr v. AAPC*, 140 S.Ct. 812 (2020). In a plurality opinion in *AAPC*, the Supreme Court held that "the 2015 government-debt exception created an unconstitutional exception to the 1991 robocall restriction." *AAPC*, 140 S. Ct. at 2348. The Court concluded the government-debt exception was content-based, subjecting it to strict scrutiny, which the government could not satisfy. *Id.* at 2346–47. To cure the unconstitutional exception, seven members of the Court invalidated the

14

government-debt exception and severed it from the rest of the statute. *Id.* at 2343, 2356.

Specifically, in Parts I and II of the opinion, Justice Kavanaugh, joined by Chief Justice Roberts and Justice Alito, determined that the government-debt exception was unconstitutional because it favored debt-collection speech over political or other speech in violation of the First Amendment. *See id.* at 2342–48. In Part III, these same three Justices concluded that the 2015 amendment should be severed from the rest of the TCPA. *Id.* at 2348–56. In a concurrence, Justice Sotomayor concluded she would have based Parts I and II on a different ground (applying intermediate as opposed to strict scrutiny to the speech) but concurred in the conclusion and in Part III with respect to severability. *Id.* at 2356–57. Dissenting in part, Justices Breyer, Ginsburg, and Kagan disagreed that the government-debt exception violated the First Amendment, but concurred with Part III in finding the exception severable. *Id.* at 2357–63. Justices Gorsuch and Thomas agreed with Parts I and II that the amendment was unconstitutional but dissented on the issue of severability. *Id.* at 2363–67. In summation, "[s]ix Members of the Court . . . conclude[d] that Congress ha[d] impermissibly favored debt-collection speech over political and other speech in violation of the First Amendment" and "[s]even Members of the Court conclude[d] that the entire 1991 robocall restriction should not be invalidated, but rather that the 2015 government-debt exception must be invalidated and severed from the remainder of the statute." *Id.* at 2343.

Of first note, this case is not about the government-debt exception. Rather, the robocall restriction provision is at issue because Plaintiff alleges PETA sent a text message to her cell phone via an ATDS without her prior express written consent. Even though the government-debt exception is not at issue in the present litigation, PETA argues that based on *Barr v. AAPC*, there cannot be **any** TCPA liability of **any kind** between 2015 (when the statute was amended to add the government-debt exception) to 2020 (when the Supreme Court struck down the government-debt exception). The Court disagrees. The *AAPC* opinion plainly contradicts PETA's assertion that the entire TCPA statute was struck down as unconstitutional. In a footnote to Part III, Justice Kavanaugh addressed precisely

15

whether the decision affected the remaining portions of the TCPA. Directly answering this question, Justice Kavanaugh wrote: "Although our decision means the end of the government-debt exception. . . . [O]ur decision today does not negate the liability of parties who made ***robocalls covered by the robocall restriction***." *AAPC*, 140 S. Ct. at 2355 n.12 (emphasis added).

PETA responds that Justice Kavanaugh's footnote is merely dicta, carrying no precedential force. (Doc. No. 72 at 9.) The Court disagrees. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). Here, it simply cannot be ignored that a total of seven Justices agreed that the government-debt exception should be severed from the rest of the TCPA, leaving all other provisions intact. Critically, three of these seven Justices—Justices Breyer, Ginsburg, and Kagan—even concluded that the government-debt exception should not be deemed unconstitutional in the first place. Because these three Justices would not even conclude that the exception is unconstitutional, it would logically follow that they would uphold the rest of TCPA. Thus, this Court must heed the conclusion of the seven Justices in agreement that the government-debt exception should be severed, leaving the remaining portions of the TCPA, including the robocall restriction undisturbed.

Even if the Court concluded that Justice Kavanaugh's footnote is dicta, this Court is nevertheless persuaded by this unambiguous announcement that the *AAPC* decision is not meant to disturb the entirety of the TPCA. Recognizing the preeminence of this nation's highest court, this Court cannot ignore such a clear statement, whether it be considered dicta or a holding. *See, e.g.*, *United States v. Montero-Camargo*, 208 F.3d 1122, 1133 n.17 (9th Cir. 2000) ("Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what the court might hold; accordingly we do not blandly shrug them off because they were not a holding.").

1    Lastly, PETA has cited to a few cases coming to a conclusion contrary to the Court's

2 today. *See Creasy v. Charter Commc'ns, Inc.*, No. 20-CV-1199, ⸺ F. Supp. 3d ⸺,

3 2020 WL 5761117 (E.D. La. Sept. 28, 2020); *Lindenbaum v. Realgy, LLC*, No. 1:19 CV

4 2862, ⸺ F. Supp. 3d ⸺, 2020 WL 6361915 (N.D. Ohio Oct. 29, 2020). But the Court

5 declines to adopt the reasoning in these out-of-circuit cases. Instead, the Court joins several

6 other district courts within the Ninth Circuit—including Judge Bashant of this district—in

7 holding that *AAPC* did not divest federal courts of jurisdiction over TCPA claims

8 concerning robocalls made between 2015 and the date of *AAPC's* issuance. *See, e.g.*,

9 *McCurley v. Royal Sea Cruises, Inc.*, No. 17-CV-00986-BAS-AGS, 2021 WL 288164, at

10 *3 (S.D. Cal. Jan. 28, 2021) ("[T]he TCPA still applies to this conduct even though it

11 occurred between 2015 and 2020."); *Johansen v. LoanDepot.com LLC, et al.*, No. 20-CV-

12 00919-DOC-JDE, 2021 WL 669329, at *3 (C.D. Cal. Jan. 31, 2021) ("As explained below,

13 the Court finds that *AAPC* does not bar the claims here. The Court in AAPC did not

14 conclude that the entire TCPA was unconstitutional."); *Stoutt v. Travis Credit Union*, No.

15 20-CV-01280-WBS-AC, 2021 WL 99636, at *5 (E.D. Cal. Jan. 12, 2021) ("[D]efendant's

16 view of severability has no foundation in law. Because the Supreme Court has invalidated

17 and severed the government-debt exception from the remainder of § 227(b)(1)(A)(iii), the

18 exception did not affect the remainder of the statute and the statute remains enforceable, at

19 least against non-government debt collectors, as to calls made between November 2015

20 and July 6, 2020."); *Trujillo v. Free Energy Sav. Co., LLC*, No. 19-CV-02072-MCS-SP,

21 2020 WL 8184336, at *5 (C.D. Cal. Dec. 21, 2020) (same); *Shen v. Tricolor California

22 Auto Grp.*, LLC, No. 20-CV-7419-PA-AGRX, 2020 WL 7705888, at *5 (C.D. Cal. Dec.

23 17, 2020) (same).

24    **2.    PETA's Challenge to the Application of the TCPA as**

25        **Unconstitutional**

26    Secondly, PETA challenges the application of the TCPA as an unconstitutional

27 restriction on free speech. (Doc. No. 65-1 at 18.) PETA argues the constitutional problem

28 is "that the FCC has interpreted the meaning of 'prior express consent' different depending

17

on the content of the call or text message." (*Id.* at 19.) The Court is without jurisdiction to entertain this argument. Indeed, the Hobbs Act provides the ***court of appeals*** with "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission." 28 U.S.C. § 2342. A regulation is considered a final FCC order. *See US W. Commc'ns, Inc. v. Jennings*, 304 F.3d 950, 958 n.2 (9th Cir. 2002) ("The Hobbs Act, 28 U.S.C. § 2342, requires that all challenges to the validity of final orders of the FCC be brought by original petition in a court of appeals . . . the district court thus lacked jurisdiction to pass on the validity of the FCC regulations"). A party may invoke this jurisdiction "only by filing a petition for review of the FCC's final order in a court of appeals naming the United States as a party." *US W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1120 (9th Cir. 1999). As a result, the validity of the FCC's interpretation of "prior express consent" in its regulations may not be challenged in this Court, and must be presumed valid at this time. *See Jennings*, 304 F.3d at 958 n.2.

* * *

In conclusion, PETA's motion to dismiss based on either the Supreme Court's decision in *AAPC* or its challenge to the application of the TCPA as unconstitutional is **DENIED**.

### D.   PETA's Motion to Dismiss or Strike Plaintiff's Nationwide Class Claims for Lack of Personal Jurisdiction (Doc. No. 29)

In its next motion, PETA argues this Court should dismiss or strike Plaintiff's nationwide class claims for lack of personal jurisdiction. PETA's argument is two-fold. First, a nationwide class action against PETA is improper because this Court does not have general jurisdiction over PETA. (Doc. No. 29-1 at 13.) Second, PETA argues based on *Bristol-Myers*, this Court lacks specific jurisdiction over the non-California class claims. (*Id.* at 7.) At most, PETA posits, specific jurisdiction may only be conferred over Plaintiff's individual claims, and the claims of putative class members who received text messages in California. In opposition, Plaintiff argues that *Bristol-Myers* is inapposite, as demonstrated

18

by the decisions of numerous federal courts. (Doc. No. 41 8–10.) The Court agrees with Plaintiff.

To exercise personal jurisdiction over an out-of-state defendant, the defendant must have "certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotations omitted)). This minimum contacts jurisdiction may be either "general or all-purpose jurisdiction," or "specific or case-linked jurisdiction." *Id.* at 919 (citing *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414 (1984)). "The paradigmatic locations where general jurisdiction is appropriate over a corporation are its place of incorporation and its principal place of business." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). Here, there is no dispute that PETA is incorporated in Virginia and has its principal place of business in Virginia. Thus, the Court cannot exercise general personal jurisdiction over PETA, and the only issue is whether the Court can exercise specific personal jurisdiction. The parties additionally do not disagree that the Court has specific jurisdiction over claims arising out of text messages sent to California cellphone numbers. Instead, the parties quarrel over whether there is specific jurisdiction over the non-California putative class members. To mount its jurisdictional attack, PETA primarily relies on the case, *Bristol-Myers* for the proposition that this Court lacks specific jurisdiction over the non-California class claims. *See Bristol-Myers Squibbs Company v. Superior Court of California*, 137 S. Ct. 1773 (2017).

In *Bristol-Myers*, a group of plaintiffs brought a state law "mass tort" action in California state court for injuries allegedly caused by Plavix, a drug manufactured and distributed by the defendant company incorporated in Delaware and headquartered in New York. *Id.* at 1777–78. The 678 plaintiffs included 86 California residents and 592 non-California residents. *Id.* at 1778. The defendant company asserted lack of personal jurisdiction and moved to quash service of the summons on the non-residents' claims,

19

which was denied and subsequently litigated through two sets of appeals in the California courts. *Id.* at 1778. The United States Supreme Court eventually concluded that the California state courts lacked specific personal jurisdiction over the out-of-state defendant for claims brought by the out-of-state plaintiffs because there were insufficient contacts between the defendant's conduct in connection with those claims and California. *Id.* at 1779–83.

Here, the parties argue whether *Bristol-Myers* requires this Court to dismiss or strike the claims asserted by putative class members who did not receive a text message in California. Fundamental to the parties' dispute is that *Bristol-Myers* concerned a mass tort action—not a class action. Furthermore, Justice Sotomayor stated in her dissenting opinion, "[t]he Court today does not confront the question whether its opinion here would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there." *Id.* at 1789 n.4 (Sotomayor, J., dissenting).

While it appears the Ninth Circuit has not addressed this precise issue, whether *Bristol-Myers* applies to class actions in federal court has been the subject of debate amongst district courts within this Circuit. Some courts, including this one, have concluded that *Bristol-Myers* applies to class actions and compels the dismissal of non-resident unnamed plaintiffs whose injuries do not arise out of, or relate to, a defendant's contacts with the forum. These courts hold that California has little interest in the claims of non-California plaintiffs arising out of contacts made outside California. *See, e.g.*, *Carpenter v. PetSmart, Inc.*, 441 F. Supp. 3d 1028, 1035 (S.D. Cal. 2020) ("That the Supreme Court did not consider whether its holding in *Bristol-Myers Squibb* would apply to class actions is hardly supportive of a holding that it does not apply to class actions."); *Goldstein v. Gen. Motors LLC*, 445 F. Supp. 3d 1000, 1012–13 (S.D. Cal. 2020) ("The federalism concerns that animated the majority's opinion in *Bristol-Myers Squibb* are equally relevant here and necessitate dismissal for lack of subject matter jurisdiction.").

But other district courts have concluded that *Bristol-Myers* does ***not*** apply to class

20

actions. These courts, including this Court, distinguish *Bristol-Myers* as only applicable in the mass tort action context. In so finding, these courts emphasize that in a mass tort action, each plaintiff is a real party in interest, named in the complaint, with individualized claims with distinct damages. By contrast, a nationwide class action is brought by one or more plaintiffs in a representative capacity, on behalf of a group of similarly situated individuals, and the "named plaintiffs" are the only plaintiffs actually named in the complaint. To apply *Bristol-Myers* to unnamed class members in a nationwide class action, these courts hold, would limit certification to only those states where the defendant is subject to general personal jurisdiction. Moreover, these courts conclude that to qualify for class action treatment under Fed. R. Civ. P. 23, an action must meet additional due process requirements that are not applicable in the *Bristol-Myers* mass tort context. *See, e.g.*, *Sousa v. 7-Eleven, Inc.*, No. 19-CV-2142 JLS (RBB), 2020 WL 6399595, at *3 (S.D. Cal. Nov. 2, 2020); *Schertzer v. Bank of Am.*, N.A., 445 F. Supp. 3d 1058, 1080 (S.D. Cal. 2020); *Branca v. Bai Brands, LLC*, No. 318CV00757BENKSC, 2019 WL 1082562, at *14 (S.D. Cal. Mar. 7, 2019) ("Thus, the Court declines to extend *Bristol-Myers* to this case."); *In re Morning Song Bird Food Litig.*, No. 12-CV-1592-JAH-AGS, 2018 WL 1382746, at *5 (S.D. Cal. Mar. 19, 2018).

In recognizing this district court divide, the Court joins with the majority of courts in taking the position that *Bristol-Myers* does not apply to federal class actions. *See Carpenter*, 441 F. Supp. 3d at 1034. While the Ninth Circuit has not expressly addressed this issue, this conclusion is consistent with at least one other circuit court of appeal which has also declined to apply *Bristol-Myers* to federal class actions. *See Mussat v. IQVIA, Inc.*, 953 F.3d 441, 448 (7th Cir. 2020) ("[A]bsentees [in a class action] are more like nonparties, and thus there is no need to locate each and every one of them and conduct a separate personal-jurisdiction analysis of their claims.").

Two reasons drive this Court's conclusion. First, the Supreme Court in *Bristol-Myers* expressly acknowledged, but left open, the question of whether its holding even extended to federal courts. *Id.* at 1783–84. The *Bristol-Myers* Court limited its ruling to the

exercise of jurisdiction by a state court, and did not resolve whether "the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1784. In *Bristol–Myers*, the Supreme Court was exclusively concerned with the unfairness of submitting an out-of-state defendant to the jurisdiction to a foreign sovereign (California) with respect to claims having no connection to California. *See Bristol–Myers*, 137 S.Ct. at 1780. But it is questionable whether cases arising out of federal question jurisdiction—such as this one based on the TCPA—present the same concerns. That is because "all federal courts, regardless of where they sit, represent the same federal sovereign, not the sovereignty of a foreign state government." *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 858–59 (N.D. Cal. 2018), order clarified, No. 16-CV-07244-EMC, 2018 WL 1156607 (N.D. Cal. Mar. 5, 2018), and on reconsideration, 438 F. Supp. 3d 1017 (N.D. Cal. 2020). Therefore, the due process concerns relating to whether a state court can hail an out-of-state defendant into its court does not exist in a purely federal case.

Second, the Court declines to extend *Bristol-Myers* to the present litigation because this case does not involve a mass tort action with consolidated individual suits. While the claims of the non-resident named plaintiffs were pertinent to the issue of specific jurisdiction in *Bristol-Myers*, "claims of unnamed class members are irrelevant to the question of specific jurisdiction." *AM Trust v. UBS AG*, 78 F. Supp. 3d 977, 986 (N.D. Cal. 2015). In a Rule 23 class action, the named plaintiffs represent the interests of absent class members. The unnamed class members are not full parties to the case for many purposes. In fact, the absent class members generally are not taken into account when deciding subject matter jurisdiction or venue. *See Devlin v. Scardelletti*, 536 U.S. 1, 9–10 (2002) ("Nonnamed class members cannot defeat complete diversity. . . ."). Further, Rule 23's requirements of numerosity, commonality, typicality, adequacy of representation, predominance, and superiority provide due process protections not available in the *Bristol-Myers* mass tort context. These requirements ensure that the class claims the defendant is required to defend against will have a degree of uniformity and consistency.

Therefore, the Court declines to apply *Bristol-Myers* in this case. PETA's motion to

22

dismiss or strike the nationwide class claims is **DENIED**.

   **E.     PETA's Motion to Stay Pending the FCC's Definition of an ATDS (Doc. No. 24)**

   PETA has filed two separate motions to stay pending (1) the FCC's clarification of an ATDS, and (2) the Supreme Court's decision in *Facebook, Inc. v. Duguid*. The Court will now address the first ground for a stay. PETA argues the case should be stayed while the FCC considers promulgating regulations further defining an ATDS. (Doc. No. 24.) To prevail under the TCPA, Plaintiff must prove that PETA sent her the text message at issue via an ATDS without sufficient prior express consent. "The three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system [ATDS]; (3) without the recipient's prior express consent." *Portfolio Recovery Assocs., LLC*, 707 F.3d at 1043. Proving that PETA used an ATDS to send the text message is an element of Plaintiff's claim. The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphases added). The TCPA empowers the FCC "to prescribe regulations to implement the requirements of this subsection," including issuing declaratory rulings defining terms within the TCPA. *See* 47 U.S.C. § 227(b)(2); 47 C.F.R. § 1.2(a).

   **1.     Background**

   As background, in July 2015, the FCC issued a declaratory order defining an ATDS as any "dialing equipment [that] generally has the capacity to store or produce, and dial random or sequential numbers even if it is not presently used for that purpose, including when the caller is calling a set list of consumers." In the Matter of Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7961, 7971–72 (July 10, 2015). On March 16, 2018, the D.C. Circuit set aside this definition of ATDS as "an unreasonably expansive interpretation of the statute" because it "would appear to subject ordinary calls from any conventional smartphone to the Act's coverage." *ACA Int'l v. FCC*,

23

885 F.3d 687, 692 (D.C. Cir. 2018).

Then, on May 14, 2018, the FCC released a Public Notice seeking comments on various issues relating to the TCPA, including: (1) what constitutes an ATDS; (2) how to interpret "capacity" in light of the D.C. Circuit's ruling; and (3) what functions telephone equipment must be able to perform to qualify as an ATDS—i.e., "If equipment cannot itself dial random or sequential numbers, can that equipment be an automatic telephone dialing system?" May 2018 FCC Public Notice, at 1–3.

Following *ACA International*, the circuit courts have split on the proper definition of an ATDS. While some circuits took a narrow view of an ATDS, the Ninth Circuit in *Marks v. Crunch San Diego, LLC* defined an ATDS broadly as: "equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically." 904 F.3d 1041, 1053 (9th Cir. 2018). The court concluded that the statutory definition of an ATDS "includes a device that stores telephone numbers to be called, whether or not those numbers have been generated by a random or sequential number generator." *Id.* at 1043.

On October 3, 2018, in response to the Ninth Circuit's decision in *Marks*, the FCC released another Public Notice, seeking additional comments on what constitutes an ATDS. Comments were due on October 17, 2018; reply comments were due on October 24, 2018. PETA argues that after considering these comments, the FCC will likely issue its new rule defining ATDS in 2020.

## 2.   Discussion

### a)   Whether A Stay is Proper Under the Primary Jurisdiction Doctrine

Citing the primary jurisdiction doctrine, PETA argues a stay is warranted pending the FCC's clarification of what constitutes a ATDS. "The primary jurisdiction doctrine allows courts to stay proceedings . . . pending the resolution of an issue within the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). The doctrine "applies in a limited set of circumstances" and "is not

24

designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit." *See id.* (internal quotations and citations omitted). Rather, the doctrine "is properly invoked when a claim is cognizable in federal court but requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002).

The Court concludes the primary jurisdiction doctrine does not support a stay. The Ninth Circuit has already provided guidance on the definition of an ATDS with its decision in *Marks*. Because the Ninth Circuit has already defined an ATDS, the Court need not consider administrative input. Thus, the Court finds the circumstances presents neither "a matter of first impression" nor "a particularly complicated issue that merits waiting for FCC guidance." *See Trim v. Mayvenn, Inc.*, No. 20-CV-03917-MMC, 2020 WL 6460543, at *6 (N.D. Cal. Nov. 3, 2020) ("[T]he Court declines to stay the instant action pending the FCC's declaratory ruling."); *Pascal v. Concentra, Inc.*, No. 19-CV-02559-JCS, 2019 WL 5458282, at *2 (N.D. Cal. Oct. 24, 2019) ("[T]he primary jurisdiction doctrine does not justify a stay in this case.").

Moreover, "courts must also consider whether invoking primary jurisdiction would needlessly delay the resolution of claims." *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015) (holding "efficiency is the deciding factor in whether to invoke primary jurisdiction"). Here, with no deadline for the FCC to clarify the definition of an ATDS, "a stay . . . pending an FCC decision could be indefinite." *See Bacon v. Artificial Grass Liquidators Location 1, Inc.*, No. 18-CV-01220-JLS-ADS, 2019 WL 8811867, at *5 (C.D. Cal. May 1, 2019). Indeed, PETA argues that a definition was likely to issue in 2020, but that year has passed, and there is still no guidance from the FCC.

### b)   Whether the Court Will Exercise Its Inherent Powers

In the alternative, PETA asks for a stay pursuant to this Court's inherent powers. (Doc. No. 24-1 at 22.) A court's power to stay proceedings is incidental to its inherent power to control the disposition of its cases in the interests of efficiency and fairness to the

25

court, counsel, and litigants. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). In determining whether to stay proceedings, the district court "must weigh competing interests and maintain an even balance" between the hardships that would be suffered by the parties if a stay were or were not granted, as well as judicial economy. *Id.* at 254–55. "If there is even a fair possibility" that the stay will harm the non-moving party, the party seeking the stay "must make out a clear case of hardship or inequity in being required to go forward." *Id.* at 255. The Ninth Circuit has clarified that these competing interests include: (1) the possible damage which may result from the granting of a stay, (2) the hardship or inequity which a party may suffer in being required to go forward, and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay. *See CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (citing *Landis*, 299 U.S. at 254–55). However, "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of Landis." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005).

The Court declines to exercise its inherent powers in staying this case pending further direction from the FCC. First, there is no imminent deadline as to when or whether the FCC will promulgate such regulations. As noted above, PETA predicted in its briefing that a decision will issue at the end of 2020. However, it is now 2021, and it does not appear the FCC has provided clear guidance on the definition of an ATDS. Therefore, the requested stay could be an indefinite one, leading to a loss of evidence and the miscarriage of justice for not only Plaintiff, but PETA as well. Second, even assuming the FCC did issue a new rule, the rule would be subject to challenge in the judicial system under the Hobbs Act, even further demonstrating the potential for delay as the cases work their way through the courts. For these reasons, the Court concludes that a stay is not warranted. *See Hoagland v. Axos Bank*, No. 19-CV-00750-BAS-JLB, 2020 WL 583974, at *4 (S.D. Cal. Feb. 6, 2020) ("Ultimately, the fact that there is no clear timeline, and, in fact, there may not be new regulations promulgated by the FCC in the near future, leads the court to

26

conclude that a stay at this stage would be inappropriate.").

### F.     PETA's Motion to Stay Pending the Supreme Court's Decision in *Facebook, Inc. v. Duguid* (Doc. No. 46)

Next, PETA requests a stay of this action pending the United States Supreme Court's decision in *Facebook, Inc. v. Duguid*. (Doc. No. 46.) As noted above, the Ninth Circuit in *Marks* provided a broad definition of an ATDS. The *Marks* case was reaffirmed in *Duguid v. Facebook, Inc.*, 926 F.3d 1146 (9th Cir. 2019). In that case, the defendant argued that it stored numbers only to be called reflexively. The messages were sent when there appeared to be unauthorized activity on an individual's Facebook account. The Court found no difference between calls made actively and those made reflexively. *Id.* The TCPA's "animating purpose" is "protecting privacy by restricting unsolicited, automated telephone calls." *Id.* Since the plaintiff alleged receiving calls that were automated, unsolicited, and unwanted, the plaintiff's allegations were sufficient. As a result, the Ninth Circuit again confirmed the definition set forth in *Marks*, defining an ATDS as "equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically." *Duguid*, 926 F.3d at 1150 (quoting *Marks*, 904 F.3d at 1053).

On July 2, 2020, the Supreme Court granted Facebook's petition for certiorari in *Facebook, Inc. v. Duguid*, scheduling oral argument for December 8, 2020. *See Facebook, Inc. v. Duguid*, 141 S. Ct. 193 (2020). In doing so, the Supreme Court agreed to decide the following question: whether the definition of ATDS in the TCPA encompasses any device that can "store" and "automatically dial" telephone numbers, even if the device does not "us[e] a random or sequential number generator." Petition for Writ of Certiorari, No. 19-511 (U.S. filed Oct. 17, 2019). The Supreme Court is likely to issue an opinion on this question in the first half of 2021, which should resolve the circuit split and provide a uniform definition of an ATDS.

Based on the foregoing, a stay pending an opinion from the Supreme Court is warranted. The first factor the Court considers is "the possible damage which may result

from the granting of a stay." *Lockyer*, 398 F.3d at 1110 (quoting *CMAX, Inc.*, 300 F.2d at 268). Plaintiff argues that she will be prejudiced by a lengthy, indefinite stay. (Doc. No. 50 at 13.) Plaintiff's concern is the risk of evidence being lost or destroyed. (*Id.* at 14–15.) The Court finds these concerns do not justify the denial of PETA's motion to stay. First, both parties have an obligation to preserve evidence. *See Canady v. Bridgecrest Acceptance Corp.*, No. CV-19-04738-PHX-DWL, 2020 WL 5249263, at *4 (D. Ariz. Sept. 3, 2020) (noting that the obligation to preserve evidence reduces the risk of evidence being destroyed, lost, corrupted, or forgotten). Second, the requested stay is not impermissibly indefinite. Unlike the uncertainty surrounding whether and when the FCC would clarify the definition of an ATDS, PETA requests a stay of these proceedings only until the Supreme Court issues a decision in *Facebook, Inc. v. Duguid*. Given that oral argument was heard in December 8, 2020, a decision is likely imminent. *Canady*, 2020 WL 5249263, at *3. Therefore, a stay would only minimally delay discovery. The obligation to preserve evidence, "coupled with the fact that the stay is not for an indefinite amount of time, further underscores that there is little risk of harm in instituting a stay." *Id.* at *4.

The second factor the Court considers is "the hardship or inequity which a party may suffer in being required to go forward." *Lockyer*, 398 F.3d at 1110 (quoting *CMAX, Inc.*, 300 F.2d at 268). PETA argues that if a stay is not granted, it will be forced to expend unnecessary time and resources litigating a matter with no clear idea as to the law that will actually apply at trial. (Doc. No. 46-1 at 17.) The Court agrees. Allowing this case to proceed pending a decision could be wasteful for all parties and result in duplicative proceedings. While "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity,'" *Lockyer*, 398 F.3d at 1112, the burden of litigating an issue that may be mooted adds to that potential hardship. PETA's interest in avoiding potentially unnecessary litigation and discovery is consistent with the Court's interest in preserving judicial resources and efficiency. This factor, therefore, weighs in favor of staying the case.

The third factor the Court considers is "the orderly course of justice measured in

28

terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Lockyer*, 398 F.3d at 1110 (quoting *CMAX, Inc.*, 300 F.2d at 268). A stay will simplify the issues in this case. Plaintiff here has made a single TCPA claim, alleging PETA sent her two identical text messages using an ATDS without her prior express written consent. To prevail on her TCPA claim, Plaintiff must prove that PETA used an ATDS to send the text messages at issue. PETA's liability for Plaintiff's sole cause of action will therefore turn on the precise issue the Supreme Court will decide, i.e. whether an ATDS requires random or sequential number generation. Although the Ninth Circuit has offered a definition of an ATDS, a stay pending the outcome of a forthcoming decision will promote the orderly course of justice by clarifying the issues involved in this case. *See Sealey v. Chase Bank (U.S.A.), N.A.*, No. 19-CV-07710-JST, 2020 WL 5814108, at *2 (N.D. Cal. Sept. 29, 2020) ("[T]he orderly course of justice dictates that [*Facebook*] should be decided first, as that case addresses the central question at issue here."). Accordingly, the Court finds that the third factor weighs in favor of granting a stay.

Therefore, after weighing the competing interests, the Court concludes that a stay is warranted pending the Supreme Court's resolution of *Facebook, Inc. v. Duguid*. Additionally, the Court declines Plaintiff's request to allow class discovery during the stay. Judicial efficiency is best promoted by the simplification of issues before discovery. The motion is **GRANTED**.

## III.    CONCLUSION

In sum, the Court hereby **ORDERS** as follows:

(1) PETA's motion to stay pending the FCC's definition of an ATDS is **DENIED**, (Doc. No. 24);

(2) PETA's motion to dismiss or strike Plaintiff's nationwide class claims is **DENIED**, (Doc. No. 29);

(3) PETA's motion to dismiss for lack of subject matter jurisdiction under Article III, or alternatively, for failure to state a claim is **DENIED**, (Doc. No. 30);

(4) Defendant Beyond Meat, Inc.'s motion to dismiss, or in the alternative, stay proceedings is **DENIED AS MOOT**, (Doc. No. 33);

(5) PETA's motion to dismiss for lack of subject matter jurisdiction pursuant to the Supreme Court's decision in *Barr v. AAPC* is **DENIED**, (Doc. No. 65); and

(6) PETA's motion to stay pending the Supreme Court's decision in *Facebook, Inc. v. Duguid* is **GRANTED**, (Doc. No. 46).

The Court **VACATES** the March 25, 2021 hearing on PETA's motion to dismiss for lack of subject matter jurisdiction. The parties are ordered to file a notice with this Court when the Supreme Court issues its ruling, or otherwise disposes of *Facebook, Inc. v. Duguid*. The notice is to include a request for a Case Management Conference.

**IT IS SO ORDERED.**

Dated:  March 12, 2021

Hon. Anthony J. Battaglia
United States District Judge